Good morning, your honors. Can you hear me? Yes. Mr. Baird? Thank you. I'm Jeffrey Baird, representing Amber Lavender. This is a case about the need for special supervision. The only two doctors who saw a plaintiff firsthand and evaluated this particular limitation found she did need special supervision. The most vivid one was Dr. Irwin. He found a failure of serial threes poor calculations, special ed history, no GED, no pastoral work, 10th grade education, but most vividly the Kleenex box test. He gave a Kleenex box to the client and then some instructions to follow. She couldn't even follow the first instruction. She asked for assurance. She made mistakes on it. She asked for help. Taking everything into account, including his the interview, as well as the testing, he concluded she's going to need special supervision. And at step five, special supervision knocks out the world of regular and continuing work. It's also true because under the Swank case, that would mean plaintiff would require a special accommodation. That's not contemplated at step five. Dr. Wheeler also reported that plaintiff would need special supervision. She was corroborated fully by Dr. Irwin and in her own observations during the interview and recording of symptoms and observing her behavior during the interview, manifesting those symptoms, simple vocabulary. Dr. Wheeler also concluded there would be a need for special supervision. The lay witness said, well, he hangs out with her every day. He's sort of her boyfriend. Difficulty understanding. Let me ask you this, counsel, because I think the hurdle in this case, or part of the hurdle in this case, is the prior adjudication and the presumption that follows from that. Is there any indication in the record that the cognitive impairments had worsened since the prior adjudication? And if there is, can you point me to where I can find that evidence in the record? Right. Compare Dr. Irwin's two opinions. Dr. Irwin had an earlier opinion that the prior ALJ relied on. The ALJ, in the case at hand, called on Dr. Irwin again, and Dr. Irwin made worse findings. That's the most clear example of the deterioration. But regarding the Chavez question, the ALJ didn't invoke res judicata at all. The ALJ said, well, there's more impairment, and let's evaluate everything, and did. The ALJ was very careful not to re-adjudicate the earlier period to avoid a de facto reopening, but the ALJ re-evaluated it every step of the way, and that means she wasn't invoking res judicata for anything. And again, res judicata is flexible. It's not a rigid concept in Social Security. So in order to make a determination as to whether her RFC changed between the prior adjudication and this one, you're saying look to Dr. Irwin's opinions? That's the most vivid one, yeah. But we also have the lay evidence. We have Dr. Wheeler. Those would indicate greater impairment than in the prior, earlier RFC. Let me make a point about the earlier RFC question. It would be great for the blames bar if every time an earlier ALJ says sedentary work but significant number, all we've got to do is wait until the person's age 50 to turn in the application on automatic pay. But that's not the way it works. Res judicata is applied flexibly, and a particular ALJ is able to make a decision how much res judicata to apply, and here the ALJ provided no res judicata. So we're looking at it as a new case to know from the day of the application forward. Well, with the presumption that she would have to overcome. The only presumption was right at the beginning when the ALJ said, does she overcome the presumption that she's continuing non-disabled? The ALJ, and I think I quoted it in the opening brief, found yes, she has overcome the presumption. So now we will move on, and the ALJ went through every step, all of the additional evidence that had come in for the second SSI claim and re-adjudicated everything anew for that second claim. I thought the ALJ found the presumptions only overcome for certain limitations, not in total. The ALJ didn't do that. She re-evaluated everything. And in particular, she re-evaluated the question of special instructions, special supervision that Dr. Wheeler and Dr. Irwin found. So that means what's at stake here is just the second application, just that second period of issue, and that was by the choice of the ALJ. In any event, the lay witness, not knowing what any doctor said, found that his girlfriend needed extra information or special help remembering information, even for simple tasks. Platter herself reported that. She did have a poor work history. The ALJ found no past relevant work. Without asserting what they call an unsuccessful work attempt, the ALJ did talk about other jobs that they all were very part-time, mostly volunteer, and might have collapsed at those jobs in the sense that she couldn't keep sustaining it, which led Dr. Wheeler to say, that's what I'm seeing too on this evaluation. She needs special help following her work. She needs special supervision. If there's no more questions at this point of me, I'll just reserve my time. All right. Thank you, counsel. Let's hear from opposing counsel. May it please the court, Jordan Goddard, appearing on behalf of Commissioner Saul. Good morning, your honors. Can you hear me okay? Yes, we can hear you. Thank you. Thank you. This was not Lavender's first application for benefits. She was previously found to be not disabled, and she now alleges many of the same impairments that were previously adjudicated. However, the ALJ reasonably found that those impairments, with the exception of her carpal tunnel syndrome, didn't significantly change from that prior adjudication, and therefore, she didn't overcome the presumption of continuing disability, at least with respect to these other impairments. I would like to start off by addressing opposing counsel's comments about what the ALJ did and how she handled the res judicata issue. Opposing counsel is simply incorrect in his reading of the decision. The ALJ repeatedly refers back to prior findings and makes it clear that she is comparing the new findings to the previous ALJ's findings throughout the decision. While she only uses the words res judicata in one paragraph at the top, you can see the analysis throughout the ALJ's decision reflects an awareness of res judicata and an application of the doctrine. Opposing counsel is simply incorrect when he says that the ALJ did not utilize this doctrine in her decision in determining that Lavender's mental functioning hadn't deteriorated from the prior determination. In fact, that's a very logical, reasonable conclusion when we consider that the types of impairments that she has are really lifelong. By her own allegation on this application, she said that her disability onset date was her birth. As opposing counsel mentioned, she was in special education. She's had limitations throughout her whole life, yet this has already been adjudicated before and found that those limitations do not result in disability. There's been no significant change. At best, you have doctors looking at the same evidence and coming to a slightly different conclusion. Chavez tells us that that is not to warrant an ALJ abandoning those prior findings. That goes both ways. Despite what my opposing counsel said, sometimes those prior findings help a disability applicant's case and sometimes they don't. As Chavez tells us, that's the law of the land. ALJs have to live with those prior findings and acknowledge them. Here, the ALJ reasonably found that with the narrow exception of this carpal tunnel syndrome, there was no significant change. Perhaps the strongest piece of evidence in that regard, I would say, are the treatment records, which Lavender doesn't want to talk about, but the ALJ points to repeatedly in her decision. Specifically, Dr. Magnuson-White, we see that in the fall of 2014, Lavender engaged in mental health treatment for the first and only time. Her testing by Dr. Magnuson-White was pretty unremarkable. During the Fulstein mini mental status examination, she scored in the normal range a score of 26, indicating no significant cognitive impairment. She was only in counseling for about four months. In January 2015, Dr. Magnuson-White said that she had reached all treatment goals and noting that things like her negative attitude had seemingly gone away. After only a few months of treatment, she had made significant progress with any sort of anxiety or depression issues. Under the Social Security Act, you're required to look at extended periods of time of 12 continuous months or longer. Short exacerbations, things like twisting your ankle, getting some depression that responds to treatment readily, these aren't the kind of things that we look at when we're evaluating disability under the Social Security Act. Logically, they don't really constitute change circumstances as contemplated under the Act. Therefore, the ALJ was very reasonable in pointing to these treatment records and pointing out that some of the testing, for example, the clinics box testing that opposing counsel talks about extensively with Dr. Irwin, only a few weeks earlier, Dr. Magnuson administered the Fulstein mini mental status examination. On the three-step task, Lavender's score was perfect. Again, overall, her cognitive functioning fell in the normal range, which directly contradicted the examination results a few weeks later of Dr. Irwin, where on the very first step, Lavender seems to have trouble. As the ALJ pointed out, there's a stark difference between Lavender's testing when it's done in a treatment environment versus a disability evaluation environment. The ALJ reasonably gave greater weight to that contradictory testing that was done in the context of treatment, as opposed to during evaluations where Lavender knew she was being evaluated specifically for disability purposes. If there are no questions from the panel, I will just ask you to affirm because the ALJ's findings were reasonable and supported by substantial evidence. Thank you, counsel. All right, your honors. On the Chavez question, I'll assert again, race judicata is not rigid, and ALJ has flexibility on applying it. Here, the ALJ never invoked race judicata. She may have compared some of the earlier ALJ findings and desperately tried not to reopen, but she really re-adjudicated everything. There was new evidence. There was Dr. Irwin, there was Dr. Wheeler, there was the additional testimony, and those showed worsening. At least, certainly Dr. Irwin's did, and we have the addition of a lay testimony. Race judicata can't apply. Regarding the challenge my opponent puts forward, the only interpretive opinions of record are by Dr. Irwin and Dr. Wheeler. The other physicians of record didn't provide interpretive opinions. They did show a course of treatment, but the actual study of what the claimant could do, the interpretive opinion, was mainly Dr. Irwin. That would be the best one. The lay testimony should be taken account of because it happened to be corroborated by Dr. Irwin and Wheeler. Claimant's own testimony, particularly regarding memory, also has, it's not really memory, it's learning and applying. It's learning and applying. That was the problem everyone found. That's really what the lay witness noted as well. If there's no further questions... Yes, we've got no further questions. Thank you very much. I'll take the matter under submission and the court will issue a decision. Thank you, counsel. Okay, thank you.
judges: Nguyen, Simon, Bumatay